UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CAUSE NO. 1:06-CR-28-TLS |
| ) | |
| FRANK D. MCGRAW ) | |

**OPINION**

The Defendant Frank McGraw was indicted on May 24, 2006, for possessing with the intent to distribute between five and fifty grams of a substance containing crack in violation of 21 U.S.C. § 841(a)(1). The Defendant seeks to suppress evidence found during a search of the Defendant's apartment on April 6, 2006. The Court held hearings on the matter on December 22, 2006, and January 8, 2007. The Defendant filed a brief supporting his motion on March 9, 2007, and the Government responded on March 29, 2007. The Defendant replied on April 11, 2007.

**A.     Evidence Presented**

*1.     Officers Decide to Condemn the Building at 2228 South Harrison*

On April 6, 2006, at about 8:15 p.m., Officers Joel Squadrito, Joe Musi, Mark Bieker, and other officers executed a search warrant for apartment 3 at 2228 South Harrison Street in Fort Wayne, Indiana. (Suppression Hr'g Tr. 8–9, Dec. 22, 2006.) The building contained three apartments, one on each floor. A common door opened from the outside to a hallway and stairway that connected to all three apartments. The Defendant, Frank McGraw, lived in apartment number 2 on the second floor. The Defendant was not present when the officers arrived and carried out their search of apartment 3.

Mark Salomon, a neighborhood code enforcement officer, was called to the location around 8:15 p.m., and he arrived about 8:45 p.m. (Tr. 63.) When he arrived, he talked to Joe Musi, the drug ordinance coordinator. Musi asked Salomon to inspect the house because Musi

noticed some possible violations of the city's housing standards. (Tr. 62–65.) Salomon found that the building lacked a working furnace. He also found other violations, including a plumbing violation and multiple electrical violations. (Tr. 65.) Salomon decided the house should be condemned. Condemnation was urgent because the house lacked heat. (Tr. 69.) Salomon wanted to see if the residents had any other heat sources in their apartments and how those heat sources were hooked up.  (Tr. 69.) They discovered that the residents had electric heaters plugged into undersized extension cords, which, in connection with the wiring found in the basement, created a fire hazard. (Tr. 69.)

Musi and Salomon told Squadrito that they were going to condemn the entire building and that the residents would need to find temporary housing. (Tr. 10.) Squadrito spoke to the residents of apartment 1 and helped them get their belongings. (Tr. 11.) Musi told Squadrito that he could not contact the resident of apartment 2 and that a large dog was inside. (Tr. 11.) Squadrito learned that the resident of apartment 2 was across the street. (Tr. 11.) At some point, uniformed officers summoned him to the building. (Tr. 38.)

## 2. *The Defendant Arrives at 2228 South Harrison and Talks to Police*

When the Defendant walked over to the apartment building, Squadrito was standing on the front porch. (Suppression Hr'g Tr. 12, Dec. 22, 2006.)  Musi and Salomon met the Defendant and talked to him on the sidewalk near the porch. (Tr. 17–18.)  Squadrito could hear their conversation from his position. (Tr. 40.) He heard Salomon explain to the Defendant that "the house was going to be condemned, that he was going to have to retrieve some of his belongings, that [the police] were going to have to go up and make sure no one was inside of his home, and he was going to have to retrieve his dog or Animal Control would take custody." (Tr. 40; *see also* tr. 12.) Squadrito heard the Defendant respond that "the dog would become vicious." (Tr. 41, *see also* tr. 12.)

2

Salomon testified that in this conversation he explained to the Defendant two times that he needed to inspect his apartment unit. (Suppression Hr'g Tr. 77, 81, Dec. 22, 2006.) He stated that he told the Defendant that he "would need to go into his apartment to do a inspection inside of his apartment to look for other housing violations. Also, we needed to make sure when we go in, because we will be boarding this structure up for security purposes, myself, police department, generally go in to make sure there are no other occupants inside the building before we secure the property." (Tr. 72.) Salomon recounted the conversation again, testifying that he told the Defendant that

> I had condemned the building through the violations that were located in the basement, that a condemnation meant that it was unfit for human occupancy, that I need to go inside to inspect all the other apartments, to do a thorough inspection to look for any other violations that might be located inside of the units, that we had needed to get into his unit, could not do that with the dog in there, because you could hear a dog through the door, and the fact that he could remove any items he needed to, because he'd have to stay someplace else for a short time frame tomorrow or as long as it took the owner to make the repairs, if the house stayed underneath the condemnation, we were going to be securing the property, both the front and the basement door up.

(Tr. 79–80.)

According to Salomon, the Defendant responded that "he would need to go in and get the dog out, because the dog . . . did not like people in uniform." (Tr. 72.) Salomon did not hear the Defendant make any other statement. (Tr. 72.) Salomon never heard the Defendant object to Salomon going into his apartment. (Tr. 77.) Salomon remained in the yard as the Defendant went up the porch and into the building to retrieve his dog. (Tr. 72–73, 78.)

As the Defendant walked into the building, Squadrito, who was still on the porch, said that he told the Defendant he "needed to retrieve his dog and his belongings, because it was going to be a day or two; be gone from this apartment for a day or two." (Tr. 50.) This was the first time Squadrito said anything to the Defendant. Squadrito said the Defendant told the officers that they were "welcome to go up there with him." (Tr. 50.)

Officer Mark Bieker was present on the porch while the Defendant was at the building. (Suppression Hr'g Tr. 5–6, Jan. 8, 2007.) Bieker was asked to remain at the front door while the Defendant retrieved his dog. (Tr. 53.) Regarding the Defendant's arrival, Bieker testified as follows:

> I didn't say anything to the individual as he was walking toward me, because he was walking—as the subject was walking across the porch from that corner, he was actually walking in the presence of a Sergeant from Vice and Narcotics, Sergeant Squadrito. And as the individuals made it to the door, the comment was made by the individual said, you know, I did not hear the conversation up to the point until it came right to where I was at the door, and the subject made the comment, "If you want to come in, you can come in." But at the time there was made —made aware of the fact that there was a pit bull in that apartment, and due to that, the subject even made the comment, "The pit bull does not like police officers."

(Tr. 54.)

Musi testified that when the Defendant was in the hallway of the building, Musi asked him, "Sir, do you mind if we go in with you to make sure there's nobody else in there?" (Suppression Hr'g Tr. 89, 96, Dec. 22, 2006.) According to Musi, the Defendant responded to Musi's question by saying, "Go ahead if you want to search," (Tr. 95, 96) or "Yeah, go ahead and come in and search if you want to," (Tr. 89). Musi characterized the Defendant's response as "more or less talking to all of us down there." (Tr. 89.) Musi testified that only one time did the Defendant say that the officers could come into the apartment. (Tr. 90.) Musi stated that the Defendant "mentioned a dog and he was very specific about the type of dog, which I don't know that much about dogs, but apparently it was a pretty nice dog and he was concerned that he wanted to go in and get it." (Tr. 95.) Musi said that he did not hear anybody say that the dog did not like people in uniform, and that he would have remembered if he had heard it, but he said he "didn't pay attention to it." (Tr. 95.) While the Defendant got his dog, Musi remained in the hallway of the building. (Tr. 89.)

The officers did not enter the apartment because they did not want to risk being bitten by

4

the Defendant's dog. (Suppression Hr'g Tr. 15, Dec. 22, 2006.)

The Defendant's mother, Margaret Massey, claimed she was driving down the street and saw police cars by her son's building, and stopped to see what was going on. (Suppression Hr'g Tr. 52, Jan. 8, 2007.) When Massey arrived, she saw the police "in and out of the vans, trucks and whatever." (Tr. 7.) She called her son Marvin, who said that the Defendant was with him. She told Marvin to tell the Defendant that the police had his house surrounded, and that "there were about a thousand of them." (Tr. 8.)

Massey said the Defendant arrived about 9:00 p.m. and talked to the officers. She saw the Defendant walk onto the porch and into the building. She overheard the conversation and said that "they told him to go in and get the dog." (Tr. 11, 17.) She also said that the officer who asked the Defendant to get his dog "pulled his weapon and stood to the side." (Tr. 17.) She was located on a street corner less than a block away. (Tr. 15.) There were a number standing in the general area. (Tr. 15.) At no time did she hear the Defendant invite the police into the apartment. (Tr. 20.)

Michelle Schiebel and Kelly Simon owned the house at 2228 South Harrison, and they both arrived sometime after 9:00 p.m. (Suppression Hr'g Tr. 29, Jan. 8, 2007.) Schiebel testified that she could not remember too much about the crowd outside the building because she was wrapped up in what was going on with the home. (Tr. 31.) When the Defendant arrived, Simon and Scheibel were standing on the front sidewalk of the property. (Tr. 33.) She saw law enforcement officers speak to the Defendant. (Tr. 34.) She heard officers give the Defendant an "ultimatum." According to Scheibel, they said that "either they were going to go up and break the door down to get the dog out or Mr. McGraw was allowed to go up and get [the] dog out himself." (Tr. 37.) She heard the Defendant say that "he had a dog in apartment two, and he need[ed] to retrieve that dog." (Tr. 35.) Counsel asked how Schiebel would describe the conversation, "conversational, loud, angry, boisterous, how?" (Tr. 37.) Scheibel responded twice

5

that the "[t]one was fine." (Tr. 37.) She did not recall hearing the Defendant give permission to the police to enter his apartment. She saw him go into the building.

The Defendant testified that when he arrived, he was introduced to the Neighborhood Code Enforcement Officer. (Suppression Hr'g Tr. 42, Jan. 8, 2007.) That officer told the Defendant that he "needed to go and retrieve [his] dog." (Tr. 42.) The Defendant testified, "I was given two things to do: Go get my dog or they are going to get my dog." (Tr. 44.) The Defendant responded that he would get his dog. The officer "didn't say he needed to go in my house or nothing." The Defendant asked the officer why his apartment had to be condemned when they had searched a different apartment. (Tr. 42.) The officer said that the whole house had to be condemned. (Tr. 42.) The Defendant said that no officer asked him for permission to enter his apartment, and that he never gave any officer permission.

### 3.   *The Defendant Leaves with his Dog*

The Defendant was in his apartment for several minutes. The Defendant stated that "I couldn't find the leash. That was what was taking me so long. So I had a Nextel phone wire for my plug for a phone and I used that to carry my dog out on." (Suppression Hr'g Tr. 44, Jan. 8, 2007.)

Squadrito told Bieker to tell the Defendant that it was time to leave. (Suppression Hr'g Tr. 56, Jan. 8, 2007; Suppression Hr'g Tr. 26, Dec. 22, 2006.) Bieker yelled up the stairwell that he needed to come out. (Suppression Hr'g Tr. 56, Jan. 8, 2007.) After yelling, Bieker said he could hear the dog's toenails on the floor of the stairwell. He asked the Defendant if he had the dog on a leash, and the Defendant said yes. At this time, Bieker says he backed off to the side so he was out of the straight path for the animal. He told those on the porch that the Defendant was coming down with his dog. (Tr. 56–57.)

Squadrito testified that as the Defendant came down, those on the porch moved to the

southwest corner of the porch. (Suppression Hr'g Tr. 26, Dec. 22, 2006.) He stated that he thought he was with Lieutenant Stoner and Musi. (Tr. 51.) When he was on the porch, Squadrito told the Defendant again that the police "were going to check his apartment. . . . He said—told us we were more than welcome to go up to his apartment, told us there was nobody inside there. We told him we had to make sure and check, which we did." (Tr. 27.) After this, the Defendant said "the door was unlocked and open." (Tr. 28, *see also* tr. 51.) The Defendant's demeanor remained cooperative as it had the entire time he was on the scene. (Tr. 27.)

None of the other individuals recalled that conversation. When the Defendant left the apartment, Salomon was not on the porch. He remained in the yard, by a tree. (Tr. 78.) Salomon stated that he saw the Defendant come out with his dog. He "came across the front porch, down the stairway and walked out to the front sidewalk." (Tr. 73.)

Musi saw the Defendant exit his apartment with his dog, and he "moved away from it." (Tr. 97.) He explained that "Me and dogs just don't get along, sir, okay? I mean, so a little Chihuahua would go after me. So when he came out, it was a pretty dog and he came out with it, and it wasn't—didn't look mean or anything like that, so I just kind of moved away from it. And he went and that was it, you know." (Tr. 97.) When asked whether there were any further conversations with the Defendant as he left, Musi replied, "I don't think so. I don't recall if he did. I didn't hear him." (Tr. 90.)

Schiebel remained on the sidewalk when the Defendant left.  (Suppression Hr'g Tr. 36, Jan. 8, 2007.) Scheibel says he came out with a dog, and after he exited the building he ran down the street. (Tr. 36.) She did not hear him say anything after he left the building. (Tr. 36.)

The Defendant testified that when he left, nobody was on the porch except for one person, and he walked past him and left. (Tr. 42.)

*4.*     *The Officers Enter the Apartment and Discover Controlled Substances*

7

After the Defendant left, Squadrito, Salomon, and Musi entered the building and went up the stairs to check the Defendant's apartment to ensure nobody was in it before closing up the building. (Suppression Hr'g Tr. 55, 74, Dec. 22, 2006.) Musi was the last one to the door, and never went inside the apartment. (Tr. 92.) Squadrito was the first to enter the apartment. (Tr. 30.) Squadrito found the door open a crack. (Tr. 28.) Squadrito said a small light in the kitchen and a television were left on. (Tr. 56.) Squadrito entered the Defendant's bedroom and looked to see whether anyone else was present. (Tr. 30.) Squadrito saw a digital scale on the night stand next to the bed that had white residue on it. Between the night stand and the wall, he saw a plastic baggie containing a green weed-like substance. (Tr. 30.) Squadrito pointed these things out to Salomon, who took pictures of the items. (Tr. 34, 74.) Squadrito also saw a black bag on the bed next to the night stand. (Tr. 34.)  Inside the bag, Squadrito observed what appeared to be crack cocaine and United States currency. (Tr.34.) Squadrito immediately had Salomon leave the apartment and said "everybody out" as he left the apartment. (Tr. 34, 92.) Squadrito called a deputy prosecutor and applied for a search warrant of the Defendant's apartment. (Tr. 35.)

**B.     Court's Factual Findings**

Before determining whether the Defendant voluntarily consented to a police search of his apartment, the Court must resolve the factual issues in dispute concerning the conversations the Defendant had with the officers before and after he entered his apartment.

The Court finds the testimony of Salomon, Musi, Squadrito, and Bieker to be credible. The slight discrepancies between the officers' testimony are due to the fact that the Defendant did not have isolated conversations with each officer, but had an ongoing dialogue that carried on as the Defendant walked from the yard, onto the porch, into the building, and up the stairwell. The conversation began with the Defendant talking to Musi and Salomon in front of the house and continued with Squadrito as the Defendant walked up the porch and into the building. Bieker

8

heard the last part of that conversation: the Defendant's response that they could come into his apartment, but that the pit bull didn't like officers. As the Defendant climbed the stairs, Musi asked the Defendant if they could go with him to check his apartment and the Defendant said yes. Also, the events described by the officers suggest that the officers were rather disorganized in reacting to the chaotic events of the evening, which also accounts for some of the discrepancies. The officers called in Salomon and an animal control officer to come in. They were helping the residents prepare to move out of the condemned building for a few days, and had a number of bystanders to deal with. Finally, there was little evidence suggesting the officers were biased or not credible.

The Court does not find the Defendant's testimony regarding his conversations with the police credible. He contradicted the testimony of  Bieker, Salomon, Musi, and Squadrito, who all credibly testified to the comments regarding his invitations to the officers and the dog not liking police officers. However, the Court does not believe all of his testimony was contrived. He included some true facts that accord with other credible testimony, such as his testimony that he asked Salomon what his apartment had to do with the condemnation and that he had trouble finding a leash and had to use a phone cord.

The Court notes that the testimony of Margaret Massey was not credible. She was combative and contentious. Also, her testimony included improbable facts that were not corroborated by any other witness. She testified that an officer told the Defendant "'Go get your dog,' pulled his weapon and stood to the side." (Suppression Hr'g Tr. 17, Jan. 8, 2007.) No other witness testified to this fact, including the Defendant. There is no evidence that would explain why an officer would draw his weapon on the Defendant. Massey also stated that the officers' conversations with the Defendant were loud. (Tr. 20–21.) Massey's testimony conflicts the testimony of those, including Scheibel, who suggested the tone and atmosphere surrounding the officers' conversations with the Defendant were calm and restrained. Scheibel said the tone of

9

the conversation was "fine." (Tr. 37–38.) Also, Massey stated that she could hear the officers talk to the Defendant on the porch from where she was standing by the alley in front of the house. (Tr. 18.) This distance appears to be about 15–20 feet. At that distance, with all the officers, residents, and bystanders on the scene, it is unlikely that Massey could hear anything the officers said to the Defendant. Massey also had an obvious bias in favor of the Defendant, her son. For these reasons, the Court does not find Massey's testimony credible.

When the Defendant arrived, he talked to Salomon and Musi. Salomon described to the Defendant what was going on: "I had condemned the building through the violations that were located in the basement, that a condemnation meant that it was unfit for human occupancy, that I need to go inside to inspect all the other apartments, to do a thorough inspection to look for any other violations that might be located inside of the units." (Suppression Hr'g Tr. 79–80, Dec. 22, 2006.) Because Salomon needed to inspect the other units, he told the Defendant that "we had needed to get into his unit, could not do that with the dog in there, because you could hear a dog through the door, and the fact that he could remove any items he needed to, because he'd have to stay someplace else." (Tr. 79–80.) Salomon also told the Defendant that the property would be secured, "both the front and the basement door up." (Tr. 79–80.)

In response to learning of the condemnation, the Defendant stated that he asked what his apartment had to do with the search of apartment three. (Suppression Hr'g Tr. 42, Jan. 8, 2007.) The Court finds this statement credible, as it explains why Salomon would tell the Defendant twice that they needed to go into his apartment to check for violations and to secure the building. (Suppression Hr'g Tr. 77, 81, Dec. 22, 2006.)

At some point, Salomon told the Defendant they heard a dog in his apartment and that he would have to remove it or Animal Control would do so. (Suppression Hr'g Tr. 40, Dec. 22, 2006; Suppression Hr'g Tr. 37, Jan. 8, 2007.) The Defendant responded that he would get the dog because "the dog did not like people in uniforms." (Suppression Hr'g Tr. 72, Jan. 8, 2007.)

Musi testified that the Defendant was concerned about the dog because it was a "nice dog" and he wanted to get it himself. (Tr. 95.)

Scheibel testified that the officers gave the Defendant an "ultimatum" that the Defendant would have to remove the dog from the apartment, or that the officers would break the door down and get it themselves. (Suppression Hr'g Tr. 37, Jan. 8, 2007.) The Court does not believe Sheibel's characterization of the conversation is completely truthful, as her demeanor suggested she was on good terms with the Defendant and was coloring her testimony to favor him. However, on cross-examination, some of her testimony—such as her description of the tone of the Defendant's conversation with the police—is accepted as true because her demeanor suggested her answers were not premeditated and because it accords with other credible testimony.

After talking to Salomon and Musi, the Defendant walked up the porch to where Bieker and Squadrito were standing. Musi walked into the house and Salomon stayed in the yard. Squadrito stated that while on the porch, he told the Defendant he needed to get his dog and whatever items he needed to live elsewhere for a few days, and that the Defendant told the officers they were welcome to come up with him. Bieker, who was in the doorway, recalled that as the Defendant walked toward him, he said "if you want to come in, you can come in" and that the "pit bull doesn't like police officers." (Suppression Hr'g Tr. 54, Jan. 8, 2007.)

Musi testified that when he was in the building, he asked the Defendant if the officers could check his apartment to make sure nobody was inside and that the Defendant said they could go ahead and search.

After a few minutes, Bieker told the Defendant to hurry up and the Defendant came down with the dog. The Defendant took as long as he did because he had trouble finding a leash for the dog and had to use a phone cord as a leash. Squadrito told the Defendant as he was walking off the porch that the officers were going to check his apartment. The Defendant responded that they

11

were "more than welcome to go up to his apartment," but there was "nobody inside there." (Suppression Hr'g Tr. 27, Dec. 22, 2006.) Squadrito replied that they had to make sure. (Tr. 27.) The Defendant said that the door was open. After the Defendant left, Squadrito and Salomon entered the apartment and discovered the scale, currency, and drugs.

The Defendant argues that Squadrito is not credible because he was the only officer to recall a conversation with the Defendant as the Defendant left the building. The Court finds Squadrito's testimony credible. The conversation was very brief; it was just a statement by Squadrito that they were going to check his apartment to ensure nobody was present, and a response by the Defendant that they were welcome to check but nobody was in there, and that he left the door open. Musi was with Squadrito and Lieutenant Stoner in a corner of the porch, and Musi did not remember the conversation. However, Musi's testimony suggested that when the Defendant left the building, he was focused on the dog. Musi's testimony that he did not recall a conversation as the Defendant left does not convince the Court that Squadrito's testimony concerning that conversation was false or misrembered.

The Defendant raises other issues with Squadrito's credibility: first, that Squadrito incorrectly thought the door had a number two on it, and second, that Squadrito thought that Musi searched the Defendant's apartment with him. The detail concerning the number on the door is a minor detail of little relevance. Squadrito's testimony that Musi entered the Defendant's apartment can be explained by the fact that Musi went up the stairs behind Squadrito and Salomon, but Squadrito ordered the officers out of the apartment before Musi entered. (Suppression Hr'g Tr. 97, Dec. 22, 2006 ("I got up to the step to the door and that's when I believe Sergeant Squadrito said, 'Everybody out.'")).

**C.     Search Analysis**

Officials may not search a residence for housing violations without a warrant. *Camara v.*

12

*Mun. Court*, 387 U.S. 523 (1967). The officers' initial search of the Defendant's apartment was warrantless, so the government must prove by a preponderance of the evidence that an exception to the warrant requirement allowed the search. *United States v. Basinski*, 226 F.3d 829, 833–34 (7th Cir. 2000). The government argues that the Defendant consented to the search of his apartment and that exigent circumstances justified his search.

### 1.     *Exigent Circumstances*

Warrantless entry and search of a home is "allowed when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant." *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2002).

The government argues that "the officers were concerned about evacuating the entire building to make sure that all occupants were out to ensure that no one was boarded up inside" and that the "police were justified and consistent in their actions by conducting protective sweeps to ensure that no one remained in the building prior to the building being boarded up, as the building was deemed not fit for human occupancy." (Gov. Br. 15, DE 38.)

This argument fails. There was no emergency requiring immediate action. There is no evidence that the temperature was dangerously cold so that anybody in the house was in danger of freezing or that the wiring was so bad that it was likely to burst into flames at any moment. The officers' belief that the house needed to be boarded up cannot create the exigency to justify the search. Once the decision was made to condemn the house, nothing prevented the police from seeking a warrant to search the rest of the house to make sure it was empty. There is no reason the officers could not have waited to board up the house until a warrant was obtained. The government offers no case law to support its argument that the facts here qualify as exigent circumstances allowing warrantless entry.

The Court finds that the government has failed to carry its burden to show exigent

circumstances justified immediate search of the Defendant's apartment.

## 2.    *Consent*

The government bears the burden of proving by a preponderance of the evidence that consent to search was freely and voluntarily given. *United States v. Grap*, 403 F.3d 439, 442 (7th Cir. 2005). "Warrantless searches are presumptively unreasonable under the Fourth Amendment, but are permissible when the defendant voluntarily consents to the search." *United States v. Strache*, 202 F.3d 980, 984 (7th Cir. 2000). Whether consent is voluntary or a product of "'duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.'" *Id.* at 985 (quoting *Schneckloth v. Bustomonte*, 412 U.S. 218, 227 (1973)). Circumstances to be considered include "(1) the age, education and intelligence of the defendant; (2) whether [the defendant] was advised of his constitutional rights; (3) the length of detention prior to consent; (4) whether [the defendant] consented immediately or police made repeated requests for consent; (5) whether physical coercion was used; (6) whether [the defendant] was in custody." *Id.* at 985. The factors are to be carefully scrutinized in the context of "'all surrounding circumstances,'" and the "'presence or absence of a single controlling criterion'" is not determinative. *Id.* (quoting *Schneckloth*, 412 U.S. at 226).

The Court finds that a totality of the circumstances shows that the Defendant voluntarily gave permission to the officers to check his apartment for code violations and to ensure nobody was present in his apartment before they boarded up the building.

The Defendant consented to a search of his apartment three times. The first time was as he walked onto the porch when he told Squadrito that the officers were welcome to go up to his apartment with him. The second time occurred inside the building when Musi asked the Defendant, "Sir, do you mind if we go in with you to make sure there's nobody else in there?" (Suppression Hr'g Tr. 89, Dec. 22, 2006.) The Defendant responded, "Yeah, go ahead and come

14

in and search if you want to." (Tr. 89.)

The Defendant argues that the scope of these consents was limited to only allow a search during the time the Defendant was in the apartment. The scope of a consent is limited to what a typical reasonable person would have understood the scope of consent to be by the exchange between the officer and the suspect. *United States v. Breit*, 429 F.3d 725, 729 (7th Cir. 2005). The first two consents would be understood by a reasonable person to be limited to the time the Defendant was in the apartment.

However, the Defendant gave permission to the officers to search a third time. When he came downstairs, Squadrito "explained to him again that we were going to check his apartment. He had left his television on or his stereo on, all the lights were on. He said—told us we were more than welcome to go up to his apartment, told us there was nobody inside there. We told him we had to make sure and check." (Suppression Hr'g Tr. 27, Dec. 22, 2006.) The Defendant was cooperative the entire time he was on the scene and had given the officers permission to come with him to search his apartment twice before. Taken along with all the other facts, the Defendant's statement that the officers were welcome to check his apartment was voluntary consent for the police to enter his apartment after he had left to ensure nobody was inside.

The Defendant argues that his invitation to the officers to come into his apartment with him and his warnings that his dog does not like police officers should have been understood by the officers as a joke. The Court agrees that the Defendant may have been joking with the officers when he told them the dog did not like officers, but the Court does not interpret his invitations to the officers to come with him as part of the joke. That is, the Defendant was not inviting the officers into the apartment so they would be attacked by the dog. His statement that the dog did not like officers seems to have been a facetious way of telling them that it would be safer if he went up there alone and got the dog out himself. The Defendant appears to have been concerned about his dog, and he did not want it to attack any of the officers. This accords with

15

the evidence that the Defendant was cooperative and that there was little tension in the officers' dealings with the Defendant. In any event, the last conversation the Defendant had as he was leaving the building could not be interpreted as a joke.

The Defendant argues that the fact that drugs were found in his apartment makes Squadrito's testimony that the Defendant told him he was welcome to search his apartment incredible. The Court disagrees. This argument assumes the Defendant knew or remembered the drugs were in his apartment, and there is no evidence of that. The Defendant never said he knew about or had anything to do with the drugs found in his apartment. If the evidence discovered was the Defendant's, the events of that night explain why he may have forgotten the items. The Defendant was in his apartment a short time, five minutes or less, and he said he was busy trying to find a leash for his dog. The facts that he left a television and a light on and could not find his dog leash suggest he was distracted by the events and could have forgotten about the drugs in the bedroom. Squadrito's testimony concerning the conversation he had with the Defendant as he was leaving is credible and the Court finds it to be true.

The Defendant's final argument is his best argument. The Defendant argues that any consent was not voluntary because the Defendant merely acquiesced to the officers' show of authority. Acquiescence to authority is insufficient to demonstrate consent. *United States v. Nafzger*, 965 F.2d 213, 216 (7th Cir. 1992). "'If the party conducting the search claimed the authority to search without consent, that factor weighs against a finding of voluntary consent.'" *Id.* at 216 (quoting *Bolden v. SEPTA*, 953 F.2d 807, 824 (3d Cir. 1991)). The question is whether the officers claimed authority to search, and if so, whether such claims outweigh the other factors suggesting consent was voluntary.

The facts present a close case, but the Court is convinced by the totality of the circumstances taken from the evidence that the officers did not claim authority to search and that consent was voluntary. This finding rests primarily on the facts that the Defendant was not a

16

suspect and had no reason to think that he was a suspect, that the Defendant gave consent to the officers to come with him into his apartment twice, that the Defendant invited them in a third time as he was leaving, and that the interactions between the Defendant and the officers had been calm and cooperative.

Salomon told the Defendant "I need to go inside to inspect all the other apartments, to do a thorough inspection to look for any other violations that might be located inside of the units, that we had needed to get into his unit, could not do that with the dog in there." (Suppression Hr'g Tr. 79–80, Dec. 22, 2006.) In the context of their conversation, Salomon's statement that he needed to enter the Defendant's apartment is best interpreted as a request. Salomon's explanation to the Defendant concerning what was going on and why they needed to condemn the building had no coercive effect, as it was never implied that the Defendant was suspected of any wrongdoing, or that he was the subject of an investigation. A statement by the code enforcement officer to a resident of a need to check for violations does not imply authority to check the apartment over any objection. Though a statement of a need to do something is not the clearest way to phrase a request, such phrasing is often used in the course of normal conversation to ask for something. The Defendant responded to the request by telling Squadrito on the porch the officers were free to come up with him to his apartment.

It is also important to note that moments later in the stairwell, Musi specifically asked the Defendant for permission to check his apartment, which implies that permission could be refused. The Defendant again said the officers could come in and search. When the Defendant left his apartment, the last officer he had spoken to was Musi. He left his apartment door open. The Defendant mentioned the door being left open to Squadrito on his way out.

Taken in isolation, Squadrito's statement to the Defendant on the porch that "we explained to him again that we were going to check his apartment" could be interpreted as a claim of authority to search without consent. (Suppression Hr'g Tr. 27, Dec. 22, 2006.)

17

However, in the context of all the circumstances, it appears that Squadrito's statement was a follow-up to the Defendant's first invitation into his apartment. The Defendant previously told Squadrito he was welcome to come with him into his apartment. Then, as the Defendant was leaving, Squadrito reminded the Defendant that he was going to check his apartment. Rather than refuse permission, or go with the officers into the apartment, the Defendant said they were welcome to go check. The Defendant told Squadrito that the door was open, and the officers found the door had been left open a crack. This third consent was enough to extend the scope of his invitation to allow the officers to search his apartment without him present. Even if one interpreted Squadrito's statement as a claim to authority to search, the authority claimed was based on the Defendant's previous consents. The Defendant's comments make no reference to a claim of authority by the officers, suggesting he was not acquiescing to a claim of authority. *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (holding that statement "You've got the badge, I guess you can" suggested the suspect was merely acquiescing to police claims to authority and did not voluntary consent to a search). The total lack of any statement by the Defendant implying that he objected to the officers' search of his apartment also suggests he voluntarily consented to the search of his apartment.

The Defendant relies on *United States v. Nafzger*, 965 F.2d 213 (7th Cir. 1992), in arguing that the Defendant's statements were acquiescence to authority and not voluntary consent. *Nafzger* held that when officers flashed a defective search warrant to a suspect, and obtained cooperation as a result, the officers' claim to authority was a factor that weighed heavily against a finding of voluntary consent. *Id.* at 216. In that case, there was nothing to suggest to the suspect that he could have refused to submit to the search. The suspect could not have been expected to determine that the warrant was defective and that it did not give the government the right to search his farm. *Id.* at 216. In this case, as explained above, the Defendant was not presented with any statement conveying a claim of authority as strong as that

18

presented in *Nafzger*.

In this case, the factors weighing against the finding that the Defendant gave consent—the officers' choice of language in requesting permission to search his apartment, and the fact that the Defendant was not told of his constitutional right to insist on a warrant—are outweighed by the factors weighing in favor of the Defendant having voluntarily consented to the search of his apartment. These factors include the facts that the Defendant was not detained or in custody, was not physically coerced, and was not suspected of any wrongdoing. The officers wanted only to check his apartment for code violations and to ensure nobody was present before boarding up the house, and the conversations between the police and the Defendant were calm and free of tension. The officers made no explicit or implicit threats to the Defendant, and they did not have their guns drawn. The Defendant was of sound mind and intellect. The Defendant invited the officers to come with him into his apartment twice, and invited them inside a third time as he was leaving.

## ORDER

For the reasons stated, the Defendant's motion to suppress [DE 23] is DENIED. A telephone conference to set a trial date is SET for Thursday, May 10, 2007, at 11:00 AM before Judge Theresa L. Springmann. The Court will initiate the call.

SO ORDERED on May 7, 2007.

                                            s/Theresa L. Springmann
                                            JUDGE THERESA L. SPRINGMANN
                                            UNITED STATES DISTRICT COURT